**Elouise Pepion COBELL,
et al., Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. CIV.A.96–1285(RCL).**

United States District Court,
District of Columbia.

March 15, 2004.

See also, 240 F.3d 1081.

Douglas B. Huron, Heller, Huron, Chertkof, Lerner, Simon & Salman, Washington, DC, for Special Master.

Alan Lee Balaran, Washington, DC, pro se.

Dennis M. Gingold, Elliott H Levitas, Keith M. Harper, Mark Kester Brown, Richard A. Guest, Washington, DC, for Plaintiffs.

Earl Old Person, Browning, MT, pro se.

Brian L. Ferrell, Charles Walter Findlay, III, Cynthia L. Alexander, Henry A. Azar, Jr., J. Christopher Kohn, Jennifer R. Rivera, John Charles Cruden, John Thomas Stemplewicz, Jonathan Brian New, Mark E. Nagle, Robert Craig Lawrence, Sandra Peavler Spooner, Seth Brandon Shapiro, Dodge Wells, Gino D. Vissicchio, John R. Kresse, John Joseph Siemietkowski, John Warshawsky, · Michael John Quinn, Phillip Martin Seligman, Terry M. Petrie, Timothy Edward Curley, Tracy Lyle Hilmer, Amalia D. Kessler, U.S. Department of Justice, Christina M. Carroll, Daniel Gordon Jarcho, Herbert Lawrence Fenster, Michael James Bearman, McKenna Long & Aldridge, LLP, Robert D. Luskin, Patton Boggs LLP, Elizabeth Wallace Fleming, John T. Richards, Jr., Trout & Richards, P.L.L.C., B. Michael Rauh, Manatt, Phelps & Phillips, L.L.P., Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

LAMBERTH, District Judge.

The Court has before it the task of deciding the Department of the Interior's May 29, 2003 Motion to Disqualify ("Motion to Disqualify") Special Master Balaran [2078]. Interior Defendants ask the Court to recuse the Special Master from further participation in this case on the grounds that the Master retained the services of a former Interior contractor to assist with his investigation into allegations that Interior filed a false and misleading Eighth Quarterly Report. Interior is not joined by its co-defendant, the Department of the Treasury.

The Court, for the reasons set forth below, finds Interior Defendants' Motion to Disqualify devoid of merit and concludes that the Special Master engaged in no untoward conduct and demonstrated no bias or partiality.

## I. BACKGROUND

On August 30, 2002, Native American Indian Distributors, Inc. ("NAID") filed a Motion for a Temporary Restraining Order, Preliminary and Permanent Injunctive Relief, protesting Interior's attempt "to punish NAID for presenting accurate and unbiased information" for inclusion in the Eighth Quarterly Report to the Court. The Court denied NAID's motion on September 24, 2002. In an effort "to ascertain," however, "whether there is any validity to NAID's contention," the Court, on November 5, 2002, ordered Special Master Balaran "to investigate whether Interior engaged in any [ ] concealment" in the

creation of the Eighth Quarterly Report. Order dated Nov. 5, 2002 at 1.[1]

The Special Master conducted his investigation and, on April 21, 2003, filed the Interim Report of the Special Master Regarding the Filing of Interior's Eighth Quarterly Report ("Interim Report"). The Interim Report set out the following "preliminary" findings:

> Interior withheld material information from the Court in the Status Report to the Court Number Eight, January 16, 2002 ("Final January Eighth Quarterly Report") and that it did so to conceal infirmities in the TAAMS system and misleading and inaccurate representations in previous quarterly submissions.... [N]either the Final January Eighth Quarterly Report, nor the Interim Report upon which it relied, was designed to provide the Court with a candid assessment of the TAAMS effort. Rather, they were contrived to present a gilded portrait of the TAAMS system and avoid adverse consequences arising from contempt proceedings pending at the time.

Interim Report at 2.

One month after the Master issued the Interim Report, Interior filed its Motion to Disqualify on the grounds that "the Special Master prepared the Report with the direct assistance of a former NAID employee, Mike S. Smith, one of the principal NAID witnesses to the events described in the Interim Report." Motion to Disqualify at 2, 3 and n. 2. Based solely on what it characterizes as "extraordinary" conduct, *id.*, Interior urges the Court not only to

---

1. The Eighth Quarterly Report was prepared and filed by Interior in accordance with the Court's December 21, 1999 Order directing the agency to "file with the court and serve upon plaintiffs quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust

declared today and to bring themselves into compliance with their statutory trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 and other applicable statutes and regulations governing the IIM trust." *Cobell v. Babbitt,* 91 F.Supp.2d 1, 56 (D.D.C.1999).

recuse Special Master Balaran from further participation in the investigation into the Eighth Quarterly Report and accord his preliminary findings no weight, but to bar him "from serving in any further capacity in this case." *Id.* at 2, n. 2.

As discussed more fully below, the Court finds that: (1) no fully informed objective observer could reasonably impute bias or prejudice to the Special Master for his conduct during the Eighth Quarterly Report investigation; (2) the Master cannot be recused pursuant to 28 U.S.C. § 455(a) and (b)(1) since his knowledge of disputed evidentiary facts was not gained extrajudicially; (3) Interior's delay in seeking the Master's disqualification constitutes a waiver; and (4) Interior has failed to meet its burden of proving "bias in fact" pursuant to § 455(b)(1).

The Court will briefly recapitulate the facts underlying this decision.

## II. THE SPECIAL MASTER'S INVESTIGATION

### A. Production of the "Administrative Record"

On October 7, 2002, the Special Master informed Interior that he was preparing to investigate NAID's allegations that the Department of the Interior concealed and withheld pertinent information from the Court in the Eighth Quarterly Report. *See* Letter from Special Master Alan L. Balaran to Justice Attorney Peter B. Miller (Oct. 7, 2002). To facilitate that investigation, the Master requested that Interior produce, among other documents, the administrative records for the Sixth and Seventh Quarterly Reports and the November 2002 draft of the Eighth Quarterly Report. The Special Master specified that the documents he sought were located in room 5141 of the Main Interior Building in a four-drawer filing cabinet; three-ring binders, and several marked and labeled boxes. *Id.*

Interior responded two days later, requesting "a copy of the order regarding this matter to avoid any misunderstanding regarding the scope of your authority from the Court to conduct such an investigation." Letter from Justice Attorney Phil Seligman to Special Master Alan L. Balaran (Oct. 9, 2002). The next day, Mr. Seligman transmitted another letter to the Master indicating that the agency had "initiated the effort to secure the documents requested in your letter of October 7, 2002," but wished first "to examine an order from the Court identifying the nature of, and authority for, your investigation...." Letter from Justice Attorney Phil Seligman to Special Master Alan L. Balaran (Oct. 10, 2002).

On November 5, 2002, the Court issued an Order of Reference directing the Special Master to investigate whether Interior withheld or concealed information in its Eighth Quarterly Report to the Court, and, "at the conclusion of his investigation, ... [to] file with the Court, with copies to defendants' and plaintiffs' counsel, his report and recommendation detailing his findings and conclusions." Order dated Nov. 5 at 1–2.

When Interior did not produce the requested documents by January 2003, the Special Master inquired into the status of the October 7, 2002 request for production. *See* Attachments to Interior Defendants' Objections to "Interim" Report of the Special Master Regarding the Filing of Interior's Eighth Quarterly Report (May 4, 2003). The agency responded on January 29, 2003, acknowledging that, "[o]n November 5, 2002, the Court entered an order authorizing your investigation into the allegations made by NAID" and assuring the Special Master that it was "willing to produce ... subject of course to any nec-

essary privilege assertions, any documents that ... would assist in [the] investigation." Letter from Justice Attorney Phil Seligman to Special Master Alan L. Balaran (Jan. 29, 2003) at 1, 2.

Two days later, Interior reassured the Special Master that,

[a]s requested, Interior will copy the entire collection of documents previously identified by you and your assistant Shana Greatman, as being possibly related to your investigation into the allegations made by a representative of an Interior contractor, Native American Industrial Distributors. Interior will conduct a privilege review of the documents in the collection and produce non-privileged documents, accompanied by a privilege log, on February 14, 2003.

Letter from Justice Attorney Phil Seligman to Special Master Alan L. Balaran (Jan. 31, 2003).

Interior did not produce the requested documents as promised. Instead the Department of Justice invited the Special Master to meet and confer with then-former NAID employee Mike Smith in room 5141 of the Main Interior Building on February 27, 2003 to jointly identify those documents responsive to the Special Master's request.

On April 4, 2003, Interior provided "[t]he first of a projected series of productions," consisting of approximately 2,310 documents "responsive to [the Special Master's] request of October 7, 2002 for documents related to [his] investigation of claims made by NAID." *See* Letter from Phil Seligman to Special Master Balaran (Apr. 4, 2003) (setting out Bates Numbers for the documents provided). This proved to be Interior's only production until June 27, 2003, when, at the Master's insistence, the Department of Justice turned over 12 boxes of documents responsive to the October 7, 2002 request. *See* Letter from Special Master Alan L. Balaran to Justice Attorney Phil Seligman at 1 (June 24, 2003) ("I am [] directing you to produce these records before the end of the month").

Justice attached the following correspondence with its production:

Enclosed are documents responsive to your request of October 7, 2002 for documents related to your investigation of claims made by NAID, as authorized in the November 5, 2002 Order of the Court ... A privilege log for those documents for which Interior wishes to assert privilege will be provided to you later ... In the meantime ... we ask that Interior be given an opportunity to assert a claim of privilege before you disclose the information in any document.

Letter from Justice Attorney Phil Seligman to Special Master Alan L. Balaran (June 27, 2003).

The Special Master responded that same day:

Thank you for producing the NAID documents to my office. In response to your concern that I not share these documents with any person affiliated with NAID, please be advised that I have no intention of doing so. Had this production, the request for which was first initiated by letter to Peter Miller dated October 7, 2002, been provided in a more timely fashion, it would not have been necessary to retain the services of an ex-NAID employee and secure the documents used in the Interim Report from outside sources. Your production this date obviates the need for such outside assistance.

Letter from Special Master Alan L. Balaran to Justice Attorney Phil Seligman (June 27, 2003).

### B. The March and April 2003 Monthly Reports of the Special Master

On April 1, 2003, the Special Master filed the Monthly Report of the Special Master, attaching his invoice for services rendered during March 2003. That invoice included 4 entries for work performed by "MSS" (Mike S. Smith) during the month of February and 61 entries for work performed during March 2003. The descriptions accompanying those entries reveal that, between February 27, 2003 and March 31, 2003, MSS reviewed Eighth Quarterly Report ("8QR") documents, chronology reports, the TAAMS template, the Records Management Template, and the probate backlog template, and he also compiled appraisal information. One of the entries reveals that, on February 27, 2003, MSS "Reviewed files in DOI regarding 8QR." A corresponding entry by the Special Master ("ALB") attached to the February Monthly Report of the Special Master (Mar. 3, 2002), indicates that, on February 27, 2003, the Master "[m]e[t] at Interior to review NAID documents." Both entries reflect that MSS and the Special Master each spent exactly one hour reviewing files and NAID documents at Interior. Invoices attached to the March 2003 Monthly Report of the Special Master also reveal that, in March, the Special Master spent no fewer than eight days drafting the Interim Report, one day "reviewing NAID documents" (3/21/03) and another "[r]eviewing NAID memoranda and e-mails relating to creation of 8QR" (3/26/03). Another time entry indicates that, on March 4, 2003, Special Master assistant Edward Volz ("EKV") conducted a "[m]eeting with Mike Smith regarding work objectives."

Interior filed no objections to the March 2003 monthly report, did not ask the Special Master to identify "MSS," did not question the Special Master's possession of NAID "documents, memoranda and e-mails," and did not question the content of the time entries of MSS and the Special Master that indicated a full months work evaluating documents Interior had not yet provided.

On April 21, 2003, the Special Master submitted his Interim Report to the Court and the parties. Footnote 1 of the Interim Report explains that the Master labeled the report "Interim" as opposed to "Final" because, at the time the report issued, he had "not [ ] received the bulk of the discovery he has repeatedly requested, [and was] constrained to utilize documentation obtained outside of normal channels and with which the parties may have no familiarity." Interim Report at 1, n. 1. The Special Master assured the parties and the Court that, "following receipt of comments by the parties, receipt of documents already requested, and oral testimony, he [would] issue a final report." *Id.*

On May 6, 2003, the Special Master filed the April Monthly Report of the Special Master describing services he rendered in April 2003. The invoices attached to the April report contain 14 time entries for MSS—two of which indicate that, on April 3 and 4, 2003, he "Draft[ed] 8th QR analysis."

Interior filed its objections to the Interim Report on May 4, 2003. Four days later, on May 8, 2003, Interior filed its Motion in Limine to Exclude Testimony of Plaintiffs' Witness Michael S. Smith, voicing, for the first time, its concern over the Special Master's retention of Mr. Smith. In that motion, Interior argued that "[t]he Special Master did not inform Interior before he hired Mike Smith, a witness to the events being investigated, to assist him in his investigation of NAID's claims." *Id.* at 3. The agency further insisted that "Mr. Smith did more than just assist in the investigation. According to the Special

Master's billing information, Mr. Smith actually drafted portions of the Interim Report." *Id.* In support, Interior cited four of the time sheet entries filed in the Special Master's March and April monthly reports—the two mentioned above (indicating that MSS "drafted 8QR analysis") and two attributable to EKV (Edward Volz, the Special Master's assistant) (indicating that, on April 15, 2003 Edward Volz "[a]ssisted the Special Master and Mike Smith editing report on the 8th Quarterly Report" and, on April 16, 2003, "[a]ssisted Mike Smith editing and organizing materials for report on the 8th Quarterly Report."). *Id.*

On May 13, 2003, Interior filed a Motion to Supplement its Objections to the Interim Report of the Special Master Regarding the Filing of Interior's Eighth Quarterly Report, maintaining that, "[a]fter its Objections were filed, [it] learned, based in part upon invoices submitted by the Special Master on May 6, 2003, the Special Master secretly hired one of the principal witnesses to the events described in the Interim Report to assist with his investigation and with the drafting of the Interim Report." On May 29, 2003, Interior filed its Motion to Disqualify.

On February 17, 2004, the Special Master filed his Motion for Leave to File Special Master Balaran's Statement in Response to Interior Defendants' Motion to Disqualify Him, which the Court granted the following day and Interior responded to on March 5, 2004. On March 8, 2004, the Special Master filed his Consent to Interior Defendants' Motion to file a Reply to His Statement, and his Motion for Leave to File a Supplemental Statement which the Court granted on March 12, 2004.

## III. GOVERNING LEGAL STANDARDS

Interior advances the argument that,

[t]he Special Master's contacts with Mr. Smith and his decision to employ Mr. Smith would cause any reasonable observer to question his impartiality and demonstrate actual bias. A judicial officer who purports neutrally to evaluate the conduct of a defendant cannot conduct extensive *ex parte* contacts with a complaining witness, much less *hire* that person to help prepare his report. And a Special Master who prejudges a defendant in this fashion and then stigmatizes it in a public report cannot properly continue as judicial officer. Recusal is therefore required.

Motion to Disqualify at 2.

 Before addressing the merits of Interior's claim, the Court notes that, when confronted with a disqualification or recusal request, it must begin its analysis with a presumption against disqualification. *See Tripp v. Executive Office of the President,* 104 F.Supp.2d 30, 34 (D.D.C. 2000) ("Judges are presumed to be impartial"); *McCann v. Communications Design Corp.,* 775 F.Supp. 1506, 1522 (D.Conn.1991) ("The judge to whom a recusal motion is addressed is presumed to be impartial"). This is because a judge, or in this instance, the Special Master, is presumed qualified to hear a proceeding, *Idaho v. Freeman,* 478 F.Supp. 33 (D.Idaho 1979), and must not be disqualified under § 455 merely because a litigant equates an adverse decision with a lack of impartiality. *Idaho v. Freeman,* 507 F.Supp. 706, 722 (D.Idaho 1981) (*citing* S.Rep. No. 93–419, 93rd Cong., 1st Sess. 1973, p. 5, U.S.Code Cong. & Admin.News 1974, p. 6351).

 Interior, to overcome this presumption, must clearly and convincingly demonstrate that Special Master conducted himself in a manner supporting his dis-

qualification. *See Kinnear–Weed Corp. v. Humble Oil & Ref. Co.*, 441 F.2d 631, 634 (5th Cir.1971) (clarifying that a party must produce clear and convincing evidence that a judge should be disqualified pursuant to section 455). Interior must also demonstrate that the Special Master's prejudice is personal and arises from extra-judicial matters. *See Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (recusal of judges for bias or prejudice under 28 U.S.C. § 455(a) and (b)(1) requires a showing that the impartiality stemmed from an extrajudicial source).[2]

 The Court also notes that Interior misstates the standard governing this Court's review. It is correct that judicial officers must be disqualified pursuant to 28 U.S.C. § 455(a) from "any proceeding in which his impartiality might reasonably be questioned." To sustain a motion for judicial disqualification, however, requires more. It demands that the judicial officer's impartiality "reasonably be questioned *by one fully apprised of the surrounding circumstances.*" *Cobell v. Norton*, 334 F.3d 1128, 1143–44 (D.C.Cir.2003) (*quoting* 28 U.S.C. § 455(a)) (emphasis added). Stated alternatively, recusal is an appropriate only if "an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case." *DeLuca v. Long Island Lighting Co.*, 862 F.2d 427, 428–29 (2d Cir.1988) (*citing Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985)).

 A necessary corollary to the objective "reasonable person" standard inherent in 455(a) is that recusal not be based on frivolous, speculative, or irrational grounds. *See Hinman v. Rogers*, 831 F.2d 937, 939–40 (10th Cir.1987); *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir.1986); *In re United States*, 666 F.2d 690, 695 (1st Cir.1981). On that score, a judge is duty bound not to recuse when faced with meritless motions to do so. *See Maier v. Orr*, 758 F.2d 1578, 1583 (Fed.Cir.1985) ("Frivolous and improperly based suggestions that a judge recuse should be firmly declined"); *M.K. Metals, Inc. v. Nat'l Steel Corp.*, 593 F.Supp. 991, 993–94 (N.D.Ill.1984) ("a judge once having drawn a case should not recuse himself on an unsupported, irrational, or highly tenuous speculation").

This is the state of the law. Before applying it, however, "it is critically important in a case of this kind to identify the facts that might reasonably cause an objective observer to question [the judicial

2. The *Liteky* majority contemplated one other scenario warranting recusal under 28 U.S.C. §§ 455(a) and (b)(1)—where the alleged bias or prejudice springs "from the facts adduced or the events occurring at trial, . . . *so extreme as to display clear inability to render fair judgment.*" *Id.* (*citing Davis v. Bd. of School Comm'rs of Mobile County*, 517 F.2d 1044, 1051 (5th Cir.1975)) (emphasis added). "Pervasive bias," however, is rare as evidenced by the fact that the *Liteky* court was constrained to travel back to 1921 in search of an example. Specifically, the Court cited to *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German–American defendants where the Supreme Court found prejudicial the following statement attributed to the District Judge: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.* at 28, 41 S.Ct. 230. In any event, it is clear that "judicial rulings . . . can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extra judicial source is involved" *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 848 (D.C.Cir.1995) (citation omitted). Interior ascribes no such conduct to the Special Master and the Court finds no evidence supporting such a charge.

officer's] impartiality." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 865, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). The "facts" as presented by Interior are: the Special Master engaged in *ex parte* communications with Mr. Smith; the Special Master hired Mr. Smith to assist him with the Eight Quarterly Report investigation; Mr. Smith's interests were adversarial to the agency at the time he assisted the Special Master; and Mr. Smith drafted the Interim Report. The Court will address each in turn.

## IV. ANALYSIS

### A. No Fully Informed Objective Observer Could Impute Bias or Prejudice to the Special Master's *Ex Parte* Communications with Mr. Smith.

■ Interior presses the argument that the Special Master's contacts with, and decision to employ, Mr. Smith raise the specter of partiality. The Court disagrees and finds that no fully informed objective observer familiar with the legal and regulatory schema governing institutional Special Masters, the history of this litigation, and the context in which Mr. Smith and the Special Master interacted, would conclude otherwise.

### 1. The Special Master's Authority to Conduct Ex Parte Investigations.

Rule 53 grants special masters broad authority "to regulate all proceedings in every hearing" and to "do all acts and take all measures necessary or proper for the efficient performance of [their] duties." Fed.R.Civ.P. 53. A careful reading of the rule reveals that the only procedural requirement imposed on a special master requires that one who conducts a hearing "make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the

Federal Rules of Evidence for a court sitting without a jury." *Id.*

Indeed, the history of Rule 53 supports an expansive interpretation of a special master's authority to determine the appropriate procedures for completing his assigned duties. Almost a century ago, former Equity Rule 62 empowered the master to "regulate all the proceedings in every hearing before him," and to "direct the mode in which the matters requiring evidence shall be proved before him; and generally to do all other acts, and direct all other inquiries and proceedings in the matters before him." *See* Rules of Practice in Equity, 226 U.S. 628, 667 (1912). This grant of authority to "direct the mode" accorded the special master discretion not only to determine the kind of proof he required but also the manner in which he would receive it.

Former Equity Rule 65, entitled "Claimants Before Master Examinable by Him," similarly established that the master was "at liberty to examine any creditor or other person coming in to claim before him, either upon written interrogatories or *viva voce,* or in both modes, as the nature of the case [ ] appear[ed] to him to require." *Id.* at 668. Like Rule 62, this rule allowed the master to choose the "modes" of accumulating evidence, thus explicitly rendering him exempt from the procedural requirements imposed on district courts. *See Cold Metal Process Co. v. United Eng'g & Foundry Co.,* 92 F.Supp. 969, 970–71 (D.Pa.1950) ("Following the practice under Equity Rule 62, the master is given the power to regulate the proceedings before him and take all measures necessary for the proper performance of his duties under the order ... [T]he court is generally loath to dictate to the master how to conduct proceedings before him, since such interference would tend to defeat the very purpose of reference") (*quoting* Moore's Federal Practice, Vol. 3, at 3134, 3135).

These principles survive and speak with compelling application today. Rule 53 grants special masters the same autonomy and discretionary authority they enjoyed in equity. Indeed, at the time the Special Master was consulting with Mr. Smith, the Supreme Court approved Revised Rule 53 and codified the practice of utilizing institutional masters long embraced by the courts. *See* Introduction to Advisory Committee Notes on 2003 Amendments to Rule 53 (the Rule 53 revisions, while "extensive[ ]," simply "reflect changing practices in using masters"); Advisory Committee Notes on Subdivision (a)(1) ("[t]he master's role in enforcement may extend to investigation in ways that are quite unlike the traditional role of judicial officers in an adversary system"). One of the "ways" institutional masters have traditionally monitored compliance with court directives is through *ex parte* communications. *See, e.g., Alberti v. Klevenhagen,* 660 F.Supp. 605, 609 (S.D.Tex.1987) (masters could "communicate with counsel for the parties from time to time in his discretion (including *ex parte* ) concerning any matters as to which the Fact Finding Special Master deems such communications to be appropriate in understanding the issues and performing his duties as a Master"); *Thompson v. Enomoto,* 815 F.2d 1323, 1326 n. 7 (9th Cir.1987) (monitor may "interview, on a confidential basis or otherwise, any person including any correctional staff member or inmate, affected by the Consent Decree").

These are the principles that have guided this Court since it first appointed the Special Master in February 1999.

## 2. The Court's Orders of Reference Authorizing the Special Master to Engage in Ex Parte Communications.

On February 22 and 24, 1999, the Court empowered the Special Master to "do all acts and take all measures necessary or proper for the efficient performance of the master's duties, as set forth in this order." Order dated Feb. 24, 1999 at 2. With the consent of the parties, on August 12, 1999, the Court expanded the Special Master's duties to include an institutional component, namely, the oversight of Interior's document retention practices "through, among other things, on-site visits to any location where IIM Records are not being protected from destruction or threatened destruction." Order dated Aug. 12, 1999 at 2.

The Court's delineation of the Special Master's authority was clear: "the Master could engage in *ex parte* communications in the discharge of his obligations." *Cobell v. Norton,* 237 F.Supp.2d 71, 75 (D.D.C. 2003) (*citing* Mem. and Order dated Mar. 29, 2002 at 7–8). In its March 29 Memorandum and Order, the Court observed that the judicial branch has "uniformly acknowledged the authority of institutional reform special masters to uncover facts and collect evidence via *ex parte* contacts with parties and counsel," and that a special master, in the context of institutional reform, may engage in *ex parte* communications. Citing a litany of legal precedent supporting the "long-established practice for special masters to conduct confidential interviews in the course of their capacity of ensuring compliance with the court's decrees," *id.* at 81, the Court "expressly permitted the Special Master to engage in *ex parte* communications in the course of his various assignments." *Id.* at 83. *See also* Mem. and Order dated Mar. 29, 2002 at 7–8 (the Orders of Reference authorized the Special Master to engage in *ex parte* communications, consistent with other courts that "have uniformly acknowledged the authority of institutional reform special masters to uncover facts and collect evidence

via *ex parte* contacts with parties and counsel").

On November 5, 2002, this Court ordered the Special Master to investigate whether Interior filed a false and misleading Eighth Quarterly Report in violation of the Court's December 21, 1999 Order to "file with the court and serve upon plaintiffs quarterly status reports." *Cobell v. Babbitt,* 91 F.Supp.2d 1, 56 (D.D.C.1999). In that capacity, the Special Master was serving as the Court's institutional master authorized to accumulate evidence either on the record or through *ex parte* contacts. The Special Master was limited only by the restriction that any report he filed that was informed by off-the-record communications "cannot be accorded the same level of deference as [those] based upon evidence received during a more formalized proceeding." *Cobell v. Norton,* 237 F.Supp.2d at 83 (citations omitted).

### 3. Interior's Approbation of the Master's *Ex Parte* Communications.

Since the Special Master was first appointed, Interior has endorsed the Special Master's authority to proceed *ex parte.* In response to the August 12, 1999 Order authorizing the Special Master to "oversee the Interior Department's retention and protection from destruction of IIM Records," Order dated Aug. 12, 1999 at 2, for example, Interior distributed memoranda to all agency and area offices informing them that the Special Master was to be allowed unfettered access to investigate the manner in which agency and area offices safeguard individual Indian trust data. See July 12, 2000 Memorandum to Bureau of Indian Affairs employees from then-Assistant Secretary for Indian Affairs Kevin Gover (informing employees that the Special Master, in the exercise of his

responsibilities may be visiting locations housing IIM records "with no advance notice" and advising them to extend the Special Master "full cooperation.").

In accordance with his understanding that "full cooperation" contemplated the *ex parte* exchange of information between the Master and agency personnel, the Special Master visited dozens of agency and area offices, interviewed employees, and published his findings in a series of reports, many critical of the agency's record keeping practices. *See, e.g.,* Report of the Special Master Regarding Site Visits to Area and Agency Offices (Oct. 29, 1999) (the Anadarko, Concho, Crow, Northern Cheyenne, Fort Belknap, Fort Peck Agency, Billings, Rosebud, and Pine Ridge Agency Offices); Third Report of the Special Master Regarding Site Visits to Area and Agency Offices (Nov. 12, 1999) (the Fort Berthold and Fort Totten Agency Offices); Fourth Site Visit Report of the Special Master to Area and Agency Offices (Nov. 29, 2000) (reporting findings following visits to the Warm Springs, Yakama Umatilla, Colville, Flathead, and Blackfeet Agency Offices).

Interior filed no objections to the Master's site visit reports and never challenged the Master on the grounds that his conclusions were based on interviews and conversations conducted outside the presence of counsel. To the contrary, the record suggests the agency was apparently so comfortable with the manner in which the Special Master conducted his investigations that two years after it initially instructed its employees to fully cooperate with the Special Master it reissued an identical directive. *See* Mar. 2, 2001 Memorandum from Deputy Commissioner of Indian Affairs Sharon Blackwell.[3]

---

**3.** Although the Department of the Treasury is not a party to Interior's efforts to unseat the

Special Master, it deserves mention that on February 23, 2001, Richard L. Gregg, Com-

Interior similarly filed no objection to the Special Master's February 8, 2001 order to "distribute an appropriate memorandum informing all employees that they may communicate directly with the Office of the Special Master concerning any IIM records-related matter *in complete confidence* and without fear of reprisal." *See Cobell v. Norton,* 231 F.Supp.2d 315, 318 (D.D.C.2002) (emphasis added). Here too, the agency went to considerable lengths to convince the Court it had complied with the Master's directive. *See* Defendants' Response to Plaintiffs' Motion for Order to Show Cause Why Secretary Norton and Her Counsel Should Not be Held in Contempt and for Sanctions for Violating the Special Master's February 8, 2001 Order and the Court's Order of February 24, 1999 and August 12, 1999 (Apr. 20, 2001).

The Court finds that, in light of this history, no fully informed objective observer could impute prejudice or bias to the Special Master for conferring with Mr. Smith on an *ex parte* basis.

**B. No Fully Informed Objective Observer Could Impute Bias or Prejudice to the Special Master's Decision to Retain the Services of Mr. Smith.**

**1. The Special Master's Right to Retain Experts.**

Interior next imputes bias to the Special Master for not only "communicating" with Mr. Smith, but for "hiring" him as well. Motion to Disqualify at 2. This argument is also without merit and a fully informed objective observer would recognize that, beyond his right to conduct interviews and discussions outside the presence of counsel, the Master was authorized, as a matter of law, to retain the services of experts. This authority is a natural outgrowth of the Court's authority,

> to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause... by appointing, either with or without the consent of the parties, special masters, auditors, examiners, and commissioners. To take and report testimony; to audit and state accounts; to make computations; to determine, where the facts are complicated and the evidence voluminous, what questions are actually in issue; to hear conflicting evidence and make findings thereon are among the purposes for which such aids to the judges have been appointed.

*Ex Parte Peterson,* 253 U.S. 300, 312–13, 40 S.Ct. 543, 64 L.Ed. 919 (1920). *See* Lance Wilfred Shoemaker, *The Use of Equitable Tools in Freeway Construction Litigation,* 28 Transp. L.J. 15, 26 (Fall 2000) ("in [the institutional] context, special masters may have the authority to conduct site visits, hire expert consultants, or collect and analyze data") (citation omitted). *See also Fox v. Bowen,* 656 F.Supp. 1236 (D.Conn.1986) (use of medical experts to assist the master in making detailed findings of fact); *United States v. Michigan,* 680 F.Supp. 928 (W.D.Mich.1987) (use of experts to review proposed mental health service plans).

In the same spirit that special masters have traditionally utilized the services of experts, the Special Master retained the services of Mr. Smith. Mr. Smith's unique qualifications as an expert with respect to the creation of the Eighth Quarterly Re-

---

missioner, Financial Management Service, and Van Zeck, Commissioner, Bureau of Public Debt, directed all senior Band or Branch records officers at Federal Reserve Banks to

"meet with Special Master Balaran and any officials accompanying him and extend to him and those with him every courtesy."

port is beyond question and is underscored by the fact that he was the one individual Interior designated to assist the Special Master with the identification of records relevant to the Eighth Quarterly Report investigation. The Special Master, recognizing that Mr. Smith possessed this unique knowledge, retained his services in accordance with the authority granted him by this Court to "do all acts and take all measures necessary or proper for the efficient performance of [his] duties." Order dated February 24, 1999 at 2.

This was not the first time the Special Master retained experts to assist him. During his five-year tenure, the Special Master has routinely retained the services of numerous individuals and entities to assist him in the fulfillment of his duties.[4] Interior has neither questioned the Master's authority to do so nor suggested that these appointments were subject to its pre-approval. In fact, the only time Interior formally took issue with the Special Master's decision to retain an expert was when he hired Joseph Christie, a former employee of the Department of the Interior for 28 years and an expert in the field of trust records. Interior's reaction to the Christie hire is instructive and warrants a brief discussion.

Mr. Christie testified on behalf of plaintiffs during the Phase I trial where he was designated an expert by the Court. By the time the Special Master retained him to provide counsel concerning IIM documentation, Mr. Christie had executed a declaration in support of plaintiffs' Motion for Preliminary Injunction Against Retaliation or Other Efforts to Influence Testimony or the Provision of Evidence and had filed formal charges against Interior alleg-

ing retaliation against him for testifying during the Phase I trial.

Interior learned of Mr. Christie's assistance to the Special Master during its review of the Special Master's time sheets. *See* Defendants' Motion to Rescind Hiring of Joseph Christie and Memorandum of Points and Authorities in Support Thereof at 2. The invoices revealed that Christie assisted the Special Master to prepare for his investigation of the Office of Trust Records; worked on quarterly reports; collected materials; prepared financial charges; and analyzed contracts, e-mails and other "materials;" and conducted numerous discussions with the Special Master. *Id.* at 3. Nonetheless, Interior Defendants raised only the possibility that Christie may be biased. At no time did they suggest the Special Master acted improperly. They certainly did not seek his recusal.

2. **The Special Master Was Constrained to Retain the Services of Mr. Smith Due to Interior's Refusal to Comply With His Repeated Directives to Produce Documents Necessary for His Investigation.**

A fully informed objective observer would also recognize that the Special Master was not only authorized to retain Mr. Smith as an expert, but compelled to do so. A review of the facts leading to Mr. Smith's hire reveals that Interior does not come to this Court with clean hands.

Interior Defendants never objected to the November 5 Order, never questioned the authority of the Special Master to conduct this investigation, and never argued that the Special Master's October 7, 2002 document request was improper or over-

---

4. For example, the Special Master has utilized the services of IBM, USinternetworking, and the Security Assurance Group in discharging the Court's December 2001 Order to

investigate the security of individual Indian trust data residing on Interior's computer systems.

broad. Nonetheless, they arrogated to themselves the right to ignore the Master's repeated production requests for eight months—obstructing the Special Master from performing his duties pursuant to the very Order it insisted on reviewing before it would provide any documents.

Based on the record before it, the Court finds that the Special Master, confronted with Interior's resistance, was compelled to retain Mr. Smith simply to carry out the Court's November 5 directive.[5] This is supported by the plain language of his June 27, 2003 letter to the Department of Justice: "Had this production, the request for which was first initiated by letter to Peter Miller dated October 7, 2002, been provided in a more timely fashion, it would not have been necessary to retain the services of an ex-NAID employee and secure the documents used in the Interim Report from outside sources." Interior has never refuted this statement.

### 3. There Is No Evidence Supporting Interior's Allegations That While Assisting the Special Master, Mr. Smith's Interests Were Adverse to the Agency.

Interior maintains that, while in the Special Master's employ, Mr. Smith was a "complaining party or witness," Motion to Disqualify at 2, a "principal NAID witness," *id.*, an "adversary witness," and an "interested witness." Interior Defs.' Reply Brief in Supp. of Mot. to Disqualify Special Master Balaran at 3, 5 (Aug. 22, 2003) ("Interior's Reply Brief"). In support, Interior supplies a January 7, 2003 settlement letter written by Mr. Smith in his capacity as NAID Vice President to the Office of the Special Trustee, challenging the agency's decision not to renew NAID's contracts. The Court finds this evidence insufficient to support either contention both as a matter of fact and as a matter of law.

Interior concedes that, at the time Mr. Smith assisted the Special Master, he maintained no affiliation with NAID. Motion to Disqualify at 2. Yet it casts him as an adversary without setting forth any evidence remotely suggesting that Mr. Smith's interests were antagonistic to those of the agency; that Mr. Smith was a "party" to any pending litigation against the agency; or that he maintained a financial interest in the outcome of the Master's investigation.

The Court finds the absence of such evidence revealing. Were Interior's allegations remotely supportable, the Court would expect Interior to have presented evidence to the Court in documentary or testimonial form. That did not happen. Instead, armed with only the January 7, 2003 letter, colorful characterizations, and a host of unsupportable inferences, Interior impugns Mr. Smith's ability to impartially assist the Special Master. As emphasized above, it is Interior that must clearly and convincingly prove to the Court that the Special Master acted improperly

---

**5.** Interior rejoins that "[i]f the Special Master had, in fact, been confronted with the kind of recalcitrance now posited by Plaintiffs, the court could have considered appropriate means of securing compliance," Interior Defendants' Reply Brief in Support of Motion to Disqualify Special Master Balaran at 5 (Aug. 22, 2003). In other words, Interior suggests that the Special Master acted improperly by not filing a request for order to show cause before engaging Mr. Smith. This argument is baseless. Such a motion would have done nothing but further delay the investigation pending a flurry of motions in which the agency would have attempted to defend its refusal to produce the requested documents. The Court finds that the Special Master, by refraining from seeking to enforce compliance, demonstrated considerable restraint. This is not the behavior of a biased judicial officer.

by hiring Mr. Smith. *Kinnear–Weed Corp. v. Humble Oil & Ref. Co.*, 441 F.2d 631, 634 (5th Cir.1971). It is not the Court's duty to connect dots that Interior is incapable of connecting on its own.

As a practical matter, the Court is loath to believe that if Mr. Smith were, as Interior insists, an "adversarial, complaining, interested witness/party," Interior would have invited him to the February 27, 2003 *ex parte* conference with the Special Master to assist with the identification of documents that might prove potentially damaging to the agency. Having done so suggests that Interior believed Mr. Smith more neutral than it now pretends.

### 4. NAID's Contract Dispute with Interior Did Not Prejudice the Special Master's Investigation.

Interior argues that the Special Master acted improperly by retaining Mr. Smith at a time when "NAID's financial interests were directly linked to the charges being investigated by the Special Master." Interior's Reply Brief at 3. This argument is also without substance.

In the first instance, NAID has never been a party to this litigation and any contractual dispute pending between NAID and Interior has never been before the Court. Indeed, NAID's request that this Court adjudicate such a controversy was soundly rejected more than five months before the Special Master retained Mr. Smith.

Beyond this, Interior's argument assumes a legal nexus between NAID's claim of retaliation and the Special Master's investigation of Interior's reporting practices, that simply does not exist. In its August 30, 2002 Motion for Temporary Restraining Order, NAID complained that the Department of the Interior retaliated against it "for presenting accurate and unbiased information and opinions" concern-

ing Interior's compliance "with this Court's Orders concerning reform of the Indian Trust Fund System." To prevail on its claim, NAID need only demonstrate that its efforts to accurately depict the state of trust reform directly resulted in the agency's refusal to renew its contract, *i.e.*, that it engaged in protected activity that directly precipitated an adverse reaction. *See Hazward v. Runyon*, 14 F.Supp.2d 120, 124 (D.D.C.1998) (to establish a claim for retaliation, a party must prove "(1) that he engaged in a statutorily protected activity; (2) that the defendant took adverse personnel action; and (3) that a causal connection existed between the two" (citations omitted)). Whether or not Interior withheld information from the Court is of no legal consequence to NAID's claims. *See Glover v. S.C. Law Enforcement Div.*, 170 F.3d 411, 414 (4th Cir.1999) (protecting against retaliation regardless of whether the statements prompting the retaliation were reasonable,).

In short, the Special Master's investigation into Interior's creation of the Eight Quarterly Report and NAID's allegations of retaliation are two distinct concepts that do not intersect factually or legally. Interior's efforts to impute bias to the Special Master by blending the two is of no moment.

### 5. There is No Evidence Supporting Interior's Allegation that Mr. Smith "Drafted" the Interim Report.

Finally, Interior argues that the Special Master must be disqualified because "Mr. Smith actually drafted and edited portions of the Interim Report." Motion to Disqualify at 7. In support of this contention, the agency directs the Court to Mr. Smith's time entries for April 3 and 4, 2003 which state that, on each day, he "Draft[ed] 8th QR Analysis" and to two

entries by the Special Master's Assistant, Edward Volz: "Assist the Special Master and Mike Smith editing report on the 8th Quarterly Report" and "Assist Mike Smith editing and organizing materials for report on the 8th Quarterly Report." The Court finds the agency's interpretation of these invoices lacking in every respect.

In the first instance, the Interim Report represents a work of considerable scholarship. It is 55 pages in length with 39 detailed footnotes and five volumes of attachments containing 73 exhibits of supporting documentation. And, as one would expect, the Special Master's time sheets reflect the considerable time the Master expended in this effort, namely, more than 135 hours drafting the Interim Report as indicated by his entries: "Draft 8QR Report," "Draft Report to the Court regarding 8QR," and "Draft Report regarding generation of Eight Quarterly Report." Mr. Smith's April 3 and 4, 2003 time entries, in contrast, simply indicate that Mr. Smith spent seven hours "Draft[ing] 8QR analysis." These entries do not state, as Interior suggests, that Mr. Smith "Drafted the Interim Report" or even "Drafted the 8QR Report." Against the backdrop of the 79 time entries for March and April 2003, describing more than 100 hours devoted to the review of a myriad of documents, Mr. Smith's April 3 and 4 time entries are capable of only one reasonable interpretation: the Special Master drafted the Interim Report while Mr. Smith reviewed documents and, on April 3 and 4, created a memorandum detailing his analysis. Nothing more.

Interior's argument that the Special Master's assistant Edward Volz drafted the Interim Report is even more unavailing. Mr. Volz's time entries reveal he did little more than assist Mr. Smith and the Master in analyzing documents necessary to completing the Interim Report.

In sum, the Court finds that it was well within the ambit of the Special Master's authority to communicate with Mr. Smith on an *ex parte* basis and to retain his services to assist with the Eighth Quarterly Report Investigation. The Court further finds no evidence supporting Interior's position that, at the time he was retained by the Special Master, Mr. Smith's interests were adverse to the agency; that Mr. Smith drafted any portion of the Interim Report; or that NAID's retaliation claim hinged on the Special Master's findings. The Court finds, instead, that Interior's charges of impropriety are misdirected and more properly should have been leveled at its own refusal to comply with the Master's request for documents and for the manner in which it deceived the Special Master into believing cooperation was forthcoming when it was not. No fully informed objective observer would find otherwise.

## C. Interior Has Failed to Meet the Extrajudicial Source Requirement Necessary to Support Recusal Pursuant to 28 U.S.C. §§ 455(a) and (b)(1).

Beyond the factual infirmities underlying Interior's allegations, the agency has failed to demonstrate that the preliminary findings of the Special Master stemmed from evidence secured outside of the judicial process. Accordingly, Interior's claim that the Special Master be recused under § 455 must fail, as a matter of law.

It is a well settled proposition that, for recusal to lie, there must be evidence the judge "relied on knowledge acquired outside such proceedings." *See Liteky v. United States*, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). This jurisdiction "ha[s] long held that to be disqualifying, the appearance of bias or prejudice must stem from an extrajudicial source."

*United States v. Barry,* 961 F.2d 260, 263 (D.C.Cir.1992); *accord United States v. Pollard,* 959 F.2d 1011, 1031 (D.C.Cir. 1992) ("the district court could not be disqualified for bias, because the bias alleged *'must stem from an extrajudicial source* and *result in an opinion on the merits* on some basis other than what the judge learned from his participation in the case'" (emphasis added) (citation omitted)); *United States v. Heldt,* 668 F.2d 1238, 1272 (D.C.Cir.1981) ("disqualification based on prejudice is required *only if the alleged prejudice stems from an extrajudicial source*" (emphasis added)). This principle was recently affirmed by the United States Court of Appeals when, pursuant to § 455(a), it vacated the appointment of the Special Master–Monitor on the grounds that he could not neutrally perform his duties as Special Master since he "had a settled opinion about what the Department should and should not do on remand to comply with the order of the District Court, *which opinion he developed in his extrajudicial role as Court Monitor with access to the internal deliberations of the Department regarding the lawsuit." Cobell v. Norton,* 334 F.3d 1128, 1144 (D.C.Cir.2003) (emphasis added).

These concerns have no application here. At all times during the Eighth Quarterly Report investigation, the Special Master was authorized to communicate with Mr. Smith on an *ex parte* basis. By definition, that exchange was not extrajudicial and the Master's findings were not part of a record created outside the Master's proper exercise of his judicial authority. This is confirmed by the Interim Report itself, an examination of which reveals findings firmly rooted in evidence accumulated by the Special Master while carrying out his institutional responsibilities, as authorized by the November 5, 2002 Order. Every fact is supported by one of the 73 exhibits the Special Master attached to his report— exhibits containing the very record Interior was ordered to turn over to the Special Master, but did not. As none of these findings were informed by extrajudicial sources, Interior's argument that the Master be recused pursuant to §§ 455(a) and (b)(1) must fail.

Interior's collateral argument that the Master be recused for having "prejudge[d][the] defendant in this fashion and then stigmatizing it in a public report," Motion to Disqualify at 2, is equally meritless. Without more, florid rhetoric cannot substitute for the agency's inability to demonstrate that the Special Master's "prejudgment" stemmed "from an extrajudicial source and result[ed] in an opinion on the merits on some basis other than what the [Special Master] learned from his participation in the case." *Pollard,* 959 F.2d at 1031. And labeling a report as "stigmatizing," without more, cannot support a finding of bias. *See Barry,* 961 F.2d at 265 (D.C.Cir.1992) (holding that § 455(a) did not require the District Court's disqualification for intemperate statements made during sentencing, in light of the fact that there "was no trace of bias in this sentencing" itself). The fact remains that every preliminary finding set out in the Interim Report is amply supported by a voluminous and painstakingly crafted record to which the Special Master invited comment and the submission of additional evidence. That Interior took offense to these preliminary findings is irrelevant. By issuing an "Interim Report" that rendered only "preliminary findings" and invited comment, the Court finds "no trace of bias."

In short, Interior cites to no finding or fact in the record remotely suggesting that the Special Master's findings were based on "extrajudicial" information. It cites no law to support the proposition that a "stigmatizing" report warrants recusal. The

Court finds these shortcomings fatal to the agency's attempt to disqualify the Special Master.

**D. Interior's Delay in Challenging the Special Master for Retaining Mr. Smith Constitutes a Waiver of its Claims under § 455(a).**

██ Interior did not seek to disqualify the Special Master until May 29, 2003—more than one month after the Interim Report issued. The record reveals, however, that the agency was aware the Special Master had retained the services of Mr. Smith on April 1, 2003, when the Special Master filed his March 2003 Monthly Report. As set out below, Interior's delay in filing the Motion to Disqualify, waives its right to do so now.

Interior maintains that only "[a]fter its Objections were filed, [it] learned, based in part upon invoices submitted by the Special Master on May 6, 2003, that the Special Master secretly hired one of the principal witnesses to the events described in the Interim Report to assist with his investigation and with the drafting of the Interim Report." Mot. to Supplement its Objections to the Interim Report of the Special Master Regarding the Filing of Interior's Eighth Quarterly Report at 1 (May 13, 2003). This assertion is contradicted by the record.

As detailed above, the Special Master, on April 1, 2003, filed the March 2003 Report of Special Master, attached to which were time sheets revealing no fewer than 65 entries for work performed by "MSS" during the months of February and March 2003. These entries indicate that in March MSS reviewed documents comprising the administrative record of the Eighth Quarterly Report—documents Interior had not yet provided to the Special Master. These entries also reveal that, on February 27, 2003, MSS "Reviewed files in

DOI regarding 8QR"—the same day the Special Master recorded his time entry: "Meeting at Interior to review NAID documents." Again, this was the very meeting arranged by Interior. Both entries record the identical time and both obviously correspond to the meeting convened by Interior between the Master and Mr. Smith. And if those entries were insufficiently detailed to place the agency on notice that Mr. Smith was conferring with the Special Master, EKV's "[m]eeting with Mike Smith regarding work objectives" on March 4, 2003, certainly was.

The Court finds that these invoices provided Interior with ample disclosure on April 1, 2003, that the Special Master had retained the services of Mr. Smith to assist him with the Eighth Quarterly Report investigation. It is inconceivable that Interior simply overlooked these entries. The Court need look no further than Interior's Motion for Reimbursement of Improper Special Master Fees dated October 2, 2003 to recognize the zeal with which the agency dissects every time entry in the Special Master's invoices. Notwithstanding, the agency filed no objection to the March 2003 monthly report; never questioned Mr. Smith's time entries; never asked the Master to identify "MSS"; and never inquired how the Master came to possess the very documents it refused to supply. Instead, Interior waited until the Master issued the Interim Report to cry foul. Its strategy is not without legal consequence.

The majority of courts interpreting § 455(a) hold that a party having knowledge of facts indicating appearance of impropriety, that continues its participation in the proceeding, and then waits until the end of the proceeding to object, may have waived its right to do so. *See, e.g., United States v. Slay,* 714 F.2d 1093, 1095 (11th Cir.1983) (denying motion to disqualify based on appearance of impropriety when

raised on appeal for first time because party's counsel had prior knowledge of relevant facts).[6] And while there is little dispute that actual knowledge will support a finding of waiver, this jurisdiction holds the view that judicial disqualification under § 455 may be waived by implication by a party possessing only constructive knowledge of facts supporting an appearance-of-bias claim who fails to object in a timely manner. *See Jenkins v. Sterlacci*, 849 F.2d 627, 634 (D.C.Cir.1988) (finding that waiver of judicial disqualification under 28 U.S.C. § 455 may be implied where the motion to disqualify "came only after proceedings before the special master had been completed and the special master's report had been filed").

This principle is best analogized to the rule of law that prohibits a defendant from "hear[ing] the verdict before contesting the impartiality of the jury and then attack[ing] the court's refusal to investigate his allegation." *United States v. Edwards*, 696 F.2d 1277, 1282 (11th Cir. 1983). *See also United States v. Breit*, 712 F.2d 81, 83 (4th Cir.1983) ("[a] defendant who remains silent about known juror misconduct—who, in effect, takes out an insurance policy against an unfavorable verdict—is toying with the court"). Here, Interior waited for the Special Master's "verdict" before filing its Motion to Disqualify. And like the disgruntled defendant who is found guilty and later argues that the jury pool was tainted, the agency, after being put on notice that Mr. Smith was assisting the Special Master, waited until it received the Interim Report to argue that the Special Master was biased. The Court finds Interior's failure to object promptly waived its right to do so now.

## E. The Agency Has Failed to Prove Bias Pursuant to 28 U.S.C. § 455(b)(1).

Interior alleges that the Special Master should be recused pursuant to 28 U.S.C. § 455(b)(1) on the grounds that, "[a] judicial officer who publicly levels grave charges against a defendant on the basis of *ex parte* communications with adverse parties has abandoned any pretext of objectivity." Motion to Disqualify at 11. This, too, is an unsupportable claim.

Whereas § 455(a) is a catchall disqualification provision, § 455(b)(1) is more narrow in scope as it requires disqualification only for "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1); *see also Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (describing § 455(a) as a " 'catchall' recusal provision, covering both 'interest or relationship' and 'bias or prejudice' grounds"). Unlike its complaint seeking recusal under § 455(a), where Interior must demonstrate that the Special Master "appears" biased, under § 455(b)(1), the agency must prove the Special Master was "in fact" biased. Indeed, the greater difficulty of proving bias in fact has led courts confronted with claims under both subsections to ignore the latter. *See, e.g., United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993).

To evaluate Interior's claim under § 455(b)(1), this Court again turns to *Jenkins v. Sterlacci* for guidance: "A party alleging actual bias on the part of a judge must prove that claim by evidence of the judge's extra judicial conduct or statements that are plainly inconsistent with his

---

**6.** Unlike disqualification under § 455(a), however, which may be waived by the parties, the grounds for disqualification under § 455(b)(1) generally cannot be waived. *See* 28 U.S.C. § 455(e).

responsibilities as an impartial decision-maker." 849 F.2d at 634 (*citing Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1301 (C.A.D.C.1988)); *United States v. Haldeman,* 559 F.2d 31, 132–34 & n. 297 (D.C.Cir.1976) (en banc).

Just as Interior has failed to demonstrate the appearance of bias, it has failed to prove its existence. Special Master Balaran's conduct in the Eighth Quarterly Report investigation was at all times undertaken in a manner consistent with his duties as an impartial institutional master. The Interim Report itself is testament to that impartiality. It sets out only "preliminary" findings; attaches every internally-referenced document; scrupulously avoids undisclosed references; and invites comments, documents and oral testimony. In light of Interior's conduct throughout the investigation, the Special Master would have been justified had he issued a final report with conclusive findings. He did not. Instead, the Master gave Interior another opportunity to produce the records he had been requesting for months as well as the opportunity to refute his findings. This is not the conduct of a biased or impartial special master.

### F. The Department of the Treasury Has Not Joined Interior in the Motion to Disqualify.

There are two federal agencies embroiled in this litigation—the Department of the Interior and the Department of the Treasury. On August 12, 1999, the Special Master assumed responsibility for ensuring that both agencies complied with the Court's orders to preserve trust documentation. In that capacity, he has visited numerous Federal Reserve Banks and branches and set out his findings in a series of reports filed with the Court. Not all of these reports have been flattering.

*See, e.g.,* Recommendation and Report of the Special Master Regarding the Delayed Disclosure of the Destruction Of Uncurrent Check Records Maintained by the Department of the Treasury Hyattsville at 120 (Dec. 3, 1999) (finding destruction of documents "part of a greater pattern of obfuscation"). *See also* Report of the Special Master Regarding the Destruction of Eleven Boxes of Treasury Securities by the Fort Worth Federal Records Center at 10 (Jan. 10, 2001) ("Treasury's lack of oversight is profoundly troubling").

Notwithstanding these findings, many of which were informed by *ex parte* communications between the Master and Treasury officials, Treasury has never objected to, nor sought the removal of, the Special Master. It has never accused the Master of engaging in "a wholly improper willingness to pre-judge." Motion to Disqualify at 11. The Court takes note of the trust reposed by Treasury in the Special Master's impartiality as manifested by its refusal to collaborate in these proceedings.

### V. CONCLUSION

A request for disqualification of a judicial officer on the basis of impartiality or bias is a serious matter that should be neither lightly considered nor readily granted. Interior Defendants' Motion to Disqualify the Special Master has not been lightly considered by this Court. After reviewing the evidence, the Court finds the Motion to Disqualify Special Master Balaran wholly insufficient. Interior has failed to set forth the facts or evidence required to support its claim that the Special Master acted in a manner inconsistent with his role as a judicial officer.

For the foregoing reasons, Interior's Motion to Disqualify Special Master Balar-

an is denied.[7]

7. The Court regrets its delay in issuing this ruling. On October 1, 2003, the Court started a six co-defendant continuing criminal enterprise, racketeering trial involving multiple murder counts as well as drug offenses. That trial is still in progress. The Court works on civil cases at night and on weekends. This is not necessarily unusual, of course, since many federal courts are overwhelmed with criminal trials.